NATIONAL TRANSFORMER CORPO-
RATION and National Inventions
Corporation, Plaintiffs,
v.
FRANCE MANUFACTURING COM-
PANY, Defendant.

NATIONAL TRANSFORMER CORPO-
RATION, Plaintiff,
v.
Percival K. RANNEY, Defendant.

Civ. A. Nos. 24548, 24549.

United States District Court,
N. D. Ohio, E. D.

May 23, 1952.

See also 10 F.R.D. 51.

John Howard Joynt, Washington, D. C., F. O. Richey, Cleveland, Ohio, Floyd H. Crews, Donald J. Overocker, and Samuel E. Darby, Jr., New York City, for plaintiff.

Albert R. Teare, Cleveland, Ohio, for defendant.

JONES, Chief Judge.

These two cases have been pending for five years. They were assigned for trial twice earlier but because of limitations of human capacity they have been delayed for trial until now.

It is my opinion that I would be in no better position to decide them than upon the conclusion of the trial and oral argument of counsel. It will not be possible to analyze the unusual mass of exhibits and the evidence and testimony of the experts or to refer to any substantial amount of it. It will be sufficient, as I think, to state my reactions and conclusions on the claims made by the respective parties and the issues presented in the two cases.

The electric lighting, or luminescent gaseous tube system art is much older than Boucher's patents and replete with examples of ideas and practices which point up the development of electrical circuit lighting in gaseous vacuum tubes, and of the fluorescent type. Transformers, of course, are old. Perhaps new uses or different constructions and applications have been apparent and designed as the art advanced.

The control of electric current circuits in lighting, with lags and leads, shunts, the disposition of primary and secondary coils of the transformer, and connections, spacing, or super-imposed primary and secondary coils, hot and cold cathode lighting means, all seem revealed in earlier patents and these and other circumstances have led to the opinion and conclusion that there is no precise novelty of an inventive character that can be identified beyond an aggregation of known elements and electrical current control and use, accomplished by rearrangement of essential means for producing the desired light. And this view applies to the transition from preheated cathode and slow starting, to cold cathode operation and quicker response. All these steps, if they may be called steps, or advances, seem to me something that electrical engineering knowledge, experience and skill could have accomplished through current or power control by the use of elements and transformer construction already understood in the lighting art.

While not each of the Boucher patents and Bridges, in issue, are devoted to the same features in luminescent tube systems, they are directed to that type of lighting, and the elements essential to accomplish what the patentees claimed for them. Nevertheless, each relates to circuit lighting and use and control of electrical energy for that purpose; arrangement of essential elements, disposition of coils in transformers and other means. I do not mean to say that the earlier patents disclosed in any one of them all of the objects and claims of Boucher and Bridges, but it seems clear to me that, with the possible exception of the instant starting feature, the arrangements and features of Boucher and

Bridges can be found in the prior art and earlier patents, and, if not precisely disclosed, the departure was obvious to those skilled in the electric tube lighting art.

What did Bridges do that was wholly new, original and not already disclosed in the prior art and earlier patents, or that engineering skill alone could not have produced? It seems clear from the evidence that the instant starting of fluorescent lights had not appeared in the market, or in public use before Bridges. But, all of Bridges patent combination of elements found in other patents, are, as I think, disclosed, or implicit, in the electric lighting art and earlier patents. I cannot cast an eye, or put a finger on any new feature that spells invention, as today is required, to sustain validity. I pretty well agree with defendant's expert, Professor Hoover, who gave it as his opinion that the greater number of the important and pertinent patents relied upon, read on each other. Any claim to inventive creation seems to be nebulous and unconvincing.

Perhaps Bridges, and no doubt Boucher, contributed something to advance the fluorescent tube lighting but, while theirs were improvements disclosing a more satisfactory gaseous tube lighting apparatus or system, I do not regard them as adequate according to today's standard of judging invention. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, at page 91, 62 S.Ct. 37, 86 L.Ed. 58; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, including concurring opinion.

What the authors of the patents in suit, including Bridges and Ranney, have done, as I see it, is to make new arrangements of electrical circuits to accomplish other obvious means of lighting, perhaps more efficient and satisfactory and with

quicker lighting action, but electrical engineering skill rather then invention brought about the result. Modification, arrangement and adaption of what was known and taught was translated by them into a better, more satisfactory and efficient lighting unit in the fluorescent field.[1]

While there was some representation of increasing public interest in the instant starter unit there was very little positive evidence of its commercial value, except the system supplied to G. L. Martin. Public acceptance and commercial success, although not determinative of validity, do help to establish novelty and utility in doubtful cases.

Boucher so combined the teachings of the earlier art and prior pertinent patents into several phases of vacuum tube lighting arrangements, that one scarcely can imagine any phase or modification that would not be infringement if the patents were valid; and Bridges added the last combination of elements to close the circuit, so to speak, that anyone undertaking the application or adaption of older principles to modifications or rearrangements would certainly run afoul of one or more of the various phases of the Boucher-Bridges combinations. The extensive descriptions and claims of these patents cannot be read without being impressed by the fulsome coverage of the various phases. I am of the opinion that electrical engineering skill, not inventive genius, is involved. But if these patents are invalid the plaintiffs have effectively pre-empted the quick starting fluorescent lighting art, and have succeeded in monopolizing that field.

On the question of the France defense of cancellation of the license agreement with the plaintiffs, I think, under the evidence before me, that the agreement was canceled within the section providing therefor. However, whether royalties

1. Reference made to answer patents that I think disclose and anticipate Boucher and Bridges:
  Holladay; Hendry; Boucher #1,950,-395, 1934; Osborne, McCarthy; Russell; Freeman.

It is my view that in these earlier patents will be found the essential elements which were later combined in Boucher and Bridges.

are required to be paid by France, from the execution of the license agreement to the date of cancellation, presents a question more difficult for satisfactory decision than other questions involved in the controversy. It is clear from the oral arguments of counsel at the conclusion of the trial that there is not agreement between them as to the meaning of several of the provisions of the license agreement.

The defendant, if I understand counsel, argues that France is not required to pay royalties due to the fact that a license agreement containing a provision for price fixing may be avoided by a licensee and the validity of the patents of the licensor challenged. Plaintiffs' counsel urged that the word "infringement" in sections 2, 6, 7, and possibly 8, was not intended to have the meaning usually applied when one talks of infringing a patent. It is not reasonable to suppose that patent attorneys preparing the license agreement would be using the word "infringement" in any sense other than in its "patent" connotation. Counsel also asserting that the effect of the Supreme Court's decision in Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165, providing that where a price fixing provision is incorporated into a license agreement, the licensee is not estopped from refusing to pay royalties and may respond in an infringement suit asserting invalidity of the licensor's patent, was overcome by deleting from the license agreement the price fixing arrangement.

Frankly, I am puzzled by the provisions of the license agreement and find myself unable clearly to determine the relative rights of the parties under it. It seems to me there has been a mistake between the parties, or a failure of the minds of the parties to meet, on just what their contractual obligations were to be. Whether this situation was due to a fear that one party might over-reach the other in the race for patent preferment in the instant lighting fluorescent lamp field, or whether there was some other undisclosed intention of the parties toward one another in entering into a contract, which to me seems ambiguous in its terms, I cannot say. In any event, feeling unable to resolve the difference and where the relative rights and obligations are, the judgment of the court is that if there was a valid agreement, it was canceled and, holding as I do that the contract is void, for ambiguity and failure to reflect a meeting of the minds, there is no recovery of royalties indicated.

Referring to paragraph 7 of the license agreement, counsel for plaintiffs argues that the provision respecting price fixing was for the benefit, and under the control, of the licensor. This does not seem to me to be consistent with the reading of the contract, and particularly in connection with paragraph 7, which provided that schedules of prices were to be included in all license agreements which were then outstanding, or which thereafter might be granted, by Boucher under its patents, and a schedule of prices as an exhibit was appended to the contract. This, it seems to me, is an added reason and cause for France cancelling the contract, as was provided by paragraph 13 of the agreement. In other words, my view of the matter now is that paragraph 7 was not included primarily and solely for the benefit of Boucher but was also for the benefit of France by protecting it against under-cutting by other licensees. The fact that the last sentence of paragraph 7 may relieve France from maintaining scheduled prices in the event of under-cutting by other Boucher licensees does not, in my view, exonerate the licensor from including price schedules in the agreements with other licensees.

On the issue raised by defendant Ranney, in Case 24549, that the plaintiff may not maintain a suit against the defendant for a declaratory judgment respecting the validity of the Ranney patent, I have reached the conclusion that the plaintiff in that case may do so, based upon a reexamination of the case of E. W. Bliss Co. v. Cold Metal Process Company, 6 Cir., 102 F.2d 105. That case

reversed the judgment and order of this court dismissing an action by Bliss upon the same general considerations involved here. The opinion of the Court of Appeals, 102 F.2d at page 109, states the following:

"Disputes sufficiently real and concrete to warrant patent infringement suits between adversaries or those in privity with them are sufficiently concrete and real to sustain a suit under the Declaratory Judgments Act [28 U.S.C.A. §§ 2201, 2202]."

Here we have a controversy which is definite and concrete, touching the legal relations of the parties having adverse legal interests. The patentee, Ranney, defendant, made a claim that his patent was being infringed by notice to the present plaintiff's predecessor. The fact that the present plaintiff may not be liable for alleged past infringement by its predecessor does not negative a present controversy since it is holding and selling the same device and may be liable for present and future infringement.

If Bridges' patent is valid, I think Ranney cannot escape infringement since, except for what I think is a better or more economic disposition of the primary and secondary coils, presents the same features and elements and function of Bridges. The Patent Office and the Court of Customs and Patent Appeals appears to have given adequate consideration to the interference issues and awarded priority to Bridges. Under counsel's summary of the interference proceedings, both in the Patent Office and in the Court of Customs and Patent Appeals, I have no disposition to find otherwise. Further support for invalidity of Ranney is found in the cross examination of Thompson in the interference, who appears to have admitted invention by him rather than by Ranney.

The fact that Ranney's is a better and more efficient unit, due to disposition of primary and secondary coils, well illustrates the tenuous character of Bridges' priority as a meritorious patented structure, and Ranney's weakness as invention

resides partly in the teachings of the prior art, and in part in what I think is important, that Ranney was able to follow Bridges, and depart only by a better, but not inventive disposition, of the coils.

It results from what has been said that judgment of dismissal may be entered in Case No. 24548 and a declaratory judgment may be entered in Case No. 24549, declaring the Ranney patent invalid. Each party to pay its own costs in each of the cases because I think that this litigation is the result of the fault of each party in permitting their relationship to deteriorate into prolonged, burdensome and costly controversy.

This memorandum and appendix will be considered compliance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Appendix: Findings and Conclusions

Civil Case No. 24548:

As to the controverted matters in issue in the above case, I find as follows:

1. That the court has jurisdiction of the parties and the subject matter.

2. As to the first cause of action, there are no royalties required to be paid under the license agreement because, among other things, the agreement provided for royalty payments only in the event of infringement.

3. As to the second cause of action, the license agreement was cancelled on May 1, 1945.

4. As to the third cause of action, there has been no infringement because the patents in suit are invalid and no injunction is indicated, nor any accounting for profits and damages can be had or recovered.

5. As to defendant France's so-called counter-claim to plaintiffs' amended complaint, they really are denials or answers thereto and require no sepcific finding.

My conclusions are:

1. That no royalties are recoverable for the period before or after cancellation of the license agreement.

2. That the patents in suit are invalid for anticipation and lack of invention.

3. That no recovery of profits and damages or accounting for alleged infringement may be had.

 Civil Case No. 24549:

As to the controverted matters in this case, I find as follows:

1. The court has jurisdiction of the parties and subject matter.

2. That there is a justiciable controversy between the parties.

3. That the defendant's Patent 2,354,879 is invalid on the basis of the same prior art patents relied upon to invalidate plaintiff's patent and for want of invention.

I conclude that plaintiff is entitled to judgment of invalidity of defendant's patent and injunction from further charge of infringement.

On Plaintiffs' Motion for Reconsideration

Consideration has been given to plaintiffs' motion and briefs for reconsideration of the court's decision of April 7, 1952.

No compelling reason is apparent to the court why a reconsideration and rehearing of the matter is essential to a better understanding of the issues involved.

I do not believe it essential to decision that a detailed analysis of each of the patents in relation to the prior art be set down in a memorandum. Nor, do I think it accurate to state that "the court treated the patents in suit as though they were a single invention and the prior art as though applicable to all". What the court, in its memorandum stated, was:

"While not each of the Boucher patents and Bridges, in issue, are devoted to the same features in luminescent tube systems, they are directed to that type of lighting, and the elements essential to accomplish what the patentees claimed for them. Nevertheless, each relates to circuit lighting and use and control of electrical energy for that purpose; arrangement of essential elements,

disposition of coils in transformers and other means. I do not mean to say that the earlier patents disclosed in any one of them all of the objects and claims of Boucher and Bridges, but it seems clear to me that, with the possible exception of the instant starting feature, the arrangements and features of Boucher and Bridges can be found in the prior art and earlier patents, and, if not precisely disclosed, the departure was obvious to these skilled in the electric tube lighting art."

The memorandum filed represents the court's considered judgment of the case and I am satisfied that reconsideration and re-argument would not produce a different result.

Motion for reconsideration denied.